UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| 1ST SIGNATURE LENDING LLC, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | 1:20-cv-2130-JMS-MPB |
| | ) | |
| BRIGHTON BANK, | ) | |
| | ) | |
| *Defendant*. | ) | |

**<u>ORDER</u>**

Plaintiff 1st Signature Lending LLC ("<u>1st Signature</u>") brings this action against Defendant Brighton Bank ("<u>Brighton</u>"), alleging that Brighton engaged in a scheme to defraud 1st Signature by attempting to collect amounts not owed and by failing to properly allocate amounts paid in connection with various loans and lines of credit, in violation of Indiana law and the federal Racketeer Influenced and Corrupt Organizations Act ("<u>RICO</u>"), 18 U.S.C. § 1962. [Filing No. 1.] Brighton has filed a Motion to Transfer Venue, seeking to transfer this case to the United States District Court for the Western District of Tennessee. [Filing No. 10.] The motion is now ripe for the Court's review.

**I.**
**STANDARD OF REVIEW**

The change of venue statute, 28 U.S.C. § 1404(a), provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). Ordinarily, a court "must evaluate both the convenience of the parties and various public-interest considerations" to "decide whether, on balance, a transfer would serve 'the convenience of parties and witnesses' and otherwise promote

1

'the interest of justice,'"[1] *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 62-63 (2013), and the movant has the burden of establishing "by reference to particular circumstances, that the transferee forum is clearly more convenient." *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219-20 (7th Cir. 1986) (citations omitted).

This analysis changes, however, when the parties are bound by a contract that contains a valid forum selection clause. *Atl. Marine*, 571 U.S. at 63. "First, the plaintiff's choice of forum merits no weight[,] . . .[and] the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Id*. Second, the court "must deem the private-interest factors to weigh entirely in favor of the preselected forum," and may consider only arguments concerning public-interest factors, which "will rarely defeat a transfer motion." *Id*. at 64. Third, "transfer of venue will not carry with it the original venue's choice-of-law rules." *Id*.

## II.
### BACKGROUND

In the Complaint, 1st Signature alleges that it entered into a Correspondent Loan Purchase Agreement (the "LPA") with Brighton in May 2015. [Filing No. 1 at 3.] The LPA, which is attached to the Complaint as an exhibit, established terms under which Brighton would purchase residential construction-to-permanent loans ("CTP loans"). [Filing No. 1 at 3; Filing No. 1-1.] Pursuant to the LPA, 1st Signature alleges, 1st Signature would originate and close CTP loans, Brighton would purchase and fund the loans, and then 1st Signature would sell the loans to the

---

[1]Private interest factors include "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive," while public interest factors include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Atl. Marine*, 571 U.S. at 63 n.6 (alteration in original) (citations omitted).

secondary market.  [Filing No. 1 at 3.]  The LPA contains the following choice-of-law and forum selection provision:

> It is mutually understood and agreed that the law of the State of Tennessee shall govern this Agreement in all respects. . . . The parties agree that the sole proper venue for the determination of any litigation commenced by [Brighton] against [1st Signature] or by [1st Signature] against [Brighton] on any basis shall be in a court of competent jurisdiction which is located in Tipton County, Tennessee, or the Western District of Tennessee, and the parties hereby expressly declare that any other venue shall be improper and each party expressly waives any right to a determination of any such litigation by a court in any other venue.

[Filing No. 1-1 at 20.]  The LPA also contains a termination provision, which provides in relevant part:

> This Agreement may be terminated as to future commitments for sale of Mortgage Loans by either party at any time, but such termination shall not in any respect change or modify the obligation of [1st Signature] with respect to Mortgage Loans already subject to a Commitment Confirmation. . . . Termination of this Agreement shall not in any way affect either [1st Signature]'s or [Brighton]'s obligations, representations, warranties, or indemnifications with respect to Mortgage Loans already purchased by [Brighton] . . . .

[Filing No. 1-1 at 18.]

According to 1st Signature, in July 2018, the Federal Deposit Insurance Corporation ("FDIC") ordered Brighton to immediately stop funding CTP loans because Brighton was overleveraged, and its capital ratio had fallen below FDIC requirements.  [Filing No. 1 at 4.]  As a result, 1st Signature alleges, Brighton was no longer able to fulfill its obligations under the LPA, and Brighton terminated the LPA pursuant to the termination provision.  [Filing No. 1 at 3-4.]  1st Signature alleges that the LPA was thereby terminated as to future commitments but not as to loans that Brighton had already committed to purchasing.  [Filing No. 1 at 3.]  1st Signature also alleges that, at the time of the termination, Brighton had already committed to 230 unfunded loans under the LPA and was obligated to provide more than $40 million to fund those loans.  [Filing No. 1 at

4.]  1st Signature asserts that Brighton breached the LPA by failing to fund and purchase those loans.  [Filing No. 1 at 4.]

The Complaint further alleges that, in August 2018, the parties entered into an agreement titled "Addendum to Brighton Bank Correspondent Loan Purchase Agreement" (the "Addendum"), which is also attached to the Complaint as an exhibit.  [Filing No. 1 at 5; Filing No. 1-2.]  According to 1st Signature, "[t]he Addendum allowed the parties to place the already purchased loans with other lenders and relieved Brighton of its obligations to fund CTP loan draws that it had not already committed to fund."  [Filing No. 1 at 5.]  However, 1st Signature alleges that "[t]he Addendum [i]s not actually an addendum" because it does not incorporate the terms of the original LPA, and instead the Addendum superseded and replaced the LPA.  [Filing No. 1 at 5.]  In relevant part, the two-page Addendum provides:

> This Addendum to Brighton Bank Correspondent Loan Purchase Agreement dated May 7, 2015 ("Addendum") is made as of the 2nd day of August, 2018 by and between Brighton Bank ("Bank"), and 1st Signature Lending, LLC ("Seller").
>
> WHEREAS, Seller purchases various mortgage loans from Bank and resells such loans to its designated parties, and during such sale process, Bank has agreed to defer the collection of interest and fees until Seller has finalized its sale and collected such interest and fees in order to repay Bank.
>
> NOW, THEREFORE, and for and in consideration of the terms and conditions set forth herein, the parties hereto agree as follows:
>
> 1.      Loan Purchase and Sale.  Bank and Seller will continue to carry on their normal course of business of the sales of mortgage loans from Bank to Seller or its designated parties.  The Bank is not obligated nor committed to fund draws if it elects not to fund.
>
> \* \* \*
>
> 4.      Governing Law.  This Addendum shall be governed by the laws of the State of Tennessee.

> 5.  _Entire Agreement._  This Addendum shall contain the entire understanding and agreement between the parties with respect to all matters referred to herein and shall supersede all prior or contemporaneous agreements, representations, discussions and understandings, oral or written, with respect to such matters.

[Filing No. 1-2 at 1.] The Addendum does not contain a forum selection clause. [_See_ Filing No. 1-2 at 1-2.]

1st Signature also alleges that it "did other types of business" and had lines of credit with Brighton in the amounts of $500,000 and $200,000. [Filing No. 1 at 6.] According to 1st Signature, in April 2020, counsel for Brighton sent a letter stating that 1st Signature was in default on both lines of credit, even though the $500,000 line of credit was current and not due to mature until June 2020. [Filing No. 1 at 7.] 1st Signature alleges that the letter also demanded that 1st Signature immediately buy back three loans that Brighton had purchased under the LPA, even though 1st Signature's obligation to purchase back loans ended when Brighton terminated the LPA. [Filing No. 1 at 7.] 1st Signature contends that "[t]he purpose of the letter was to coerce 1st Signature into paying amounts it did not owe." [Filing No. 1 at 7.]

According to 1st Signature, on May 20, 2020 it paid $500,420.05 to Brighton to pay off the $500,000 line of credit, but Brighton misappropriated those funds for its own purposes instead of applying the funds to the line of credit balance. [Filing No. 1 at 6.] 1st Signature also alleges that it wired $39,080.79 to Brighton on April 22, 2020 to pay off the $200,000 line of credit, which Brighton applied to the balance, and Brighton's counsel acknowledged that the line of credit was paid in full. [Filing No. 1 at 7.] Nevertheless, 1st Signature alleges, in July 2020 when 1st Signature closed on the final property that had been secured by the $200,000 line of credit, Brighton falsely represented to the title company that $38,739.05 remained owing, which caused

the title company to wire that sum to Brighton, even though that money rightfully belonged to 1st Signature. [Filing No. 1 at 8.]

In the Complaint, 1st Signature asserts that it "brings this action to stop Brighton from asserting rights under the agreement Brighton terminated, to have the loan payoffs applied correctly, and to recover damages caused by Brighton's criminal conduct." [Filing No. 1 at 2.] 1st Signature asserts seven claims against Brighton. [Filing No. 1 at 8-16.] In Count 1, 1st Signature "seeks a judicial declaration of the parties' respective rights, obligations, and duties under the terminated [LPA] and Addendum, including a declaration that 1st Signature has no further obligations under those agreements." [Filing No. 1 at 9.] In Count 2, 1st Signature seeks a declaratory judgment that both the $500,000 line of credit and the $200,000 line of credit are paid in full. [Filing No. 1 at 9-10.] In Counts 3, 4, and 5, respectively, 1st Signature asserts that Brighton committed theft, conversion, and deception under Indiana law relating to the funds it was wired by the title company. [Filing No. 1 at 10-12.] In Count 6, 1st Signature asserts a claim under Indiana law relating to Brighton's purported pattern of racketeering activity intended to deprive 1st Signature of its property. [Filing No. 1 at 12-13.] Finally, in Count 7, 1st Signature asserts a claim under RICO that Brighton engaged in a pattern of racketeering activity. [Filing No. 1 at 13-16.]

## III.
### DISCUSSION

In its motion for transfer, Brighton argues that the forum selection clause contained in the LPA requires that this case be transferred to the Western District of Tennessee. [Filing No. 11 at 6-7.] Specifically, Brighton asserts that the forum selection clause is valid under Tennessee law, which applies to the LPA pursuant to the choice-of-law provision, and under Indiana law to the extent it applies. [Filing No. 11 at 6.] Brighton argues that the forum selection clause is not

unconscionable or the result of misrepresentation, duress, or abuse of economic power, and instead represents a negotiated agreement between two sophisticated commercial parties. [Filing No. 11 at 6.] Finally, Brighton asserts that 1st Signature cannot meet its heavy burden of demonstrating that transfer is inappropriate, and that enforcement of the forum selection clause is consistent with Tennessee law, the language of the clause, and the settled expectations of the parties. [Filing No. 1 at 7.]

1st Signature responds that the forum selection clause in the LPA is no longer enforceable because the LPA was terminated. [Filing No. 16 at 4-6.] Instead, 1st Signature asserts, pursuant to Tennessee's merger doctrine, the parties' relationship is governed by the Addendum,[2] which does not contain a forum selection clause. [Filing No. 16 at 5-6.] 1st Signature also argues that this case is not within the scope of the forum selection clause because it "is primarily one for theft and a RICO conspiracy to carry out a broad range of crimes in Indiana." [Filing No. 16 at 6.] 1st Signature contends that it has not brought a claim for breach of the LPA, that it only seeks a declaration related to the LPA because Brighton used that document as a part of its broader conspiracy, and that "[t]he six main counts of the complaint have nothing to do with the rescinded LPA." [Filing No. 16 at 6-7.]

In reply, Brighton maintains that the LPA's forum selection clause is enforceable and remains unmodified by the Addendum. [Filing No. 17 at 1-7.] Specifically, Brighton argues that

---

[2] In its briefing, 1st Signature refers to the Addendum as "the Replacement Agreement." [*See* Filing No. 16.] Brighton takes issue with this label, arguing that 1st Signature "attempts to manufacture support for [its] argument by recasting and redefining the Addendum as a 'Replacement Agreement'" and that "[t]his play on words reveals the lengths Plaintiff is stretching to avoid the LPA and its forum selection clause, and to make the Addendum something it is not." [Filing No. 17 at 4.] In the interest of consistency with the Complaint, Brighton's briefing, and the title of the document itself, the Court will use the term "Addendum," recognizing that the label used is not dispositive of the legal status or effect of the document.

the termination provision of the LPA expressly provides that termination does not alter the parties' obligations with respect to existing commitments, and therefore the forum selection clause survives termination of the LPA and continues to bind the parties. [Filing No. 17 at 2-3.] Brighton asserts that several courts have held that whether an agreement has been terminated is not dispositive of whether its forum selection clause is enforceable. [Filing No. 17 at 3.] In addition, Brighton argues that the Addendum did not wholly rescind or replace the LPA because the Addendum does not contain a clear expression of intent to vitiate the LPA or its forum selection clause, and instead acknowledges that the parties continue to operate pursuant to the LPA with some specified modifications. [Filing No. 17 at 4-6.] According to Brighton, the inclusion of a merger clause in the Addendum "merely merged prior negotiations over the terms of the Addendum" and "did not transform [the Addendum] into a super-agreement that entirely replaced and rescinded the LPA." [Filing No. 17 at 6.] Rather, Brighton asserts, "the interplay between the LPA and the Addendum – and the determination of what rights and obligations under the LPA survived Brighton's termination as to future commitments, and the parties' execution of the LPA's Addendum – are central factual and legal questions in this lawsuit" that are subject to the forum selection clause. [Filing No. 17 at 6-7.] Brighton further argues that all of 1st Signature's claims fall within the broad scope of the forum selection clause, which covers any litigation commenced by 1st Signature on any basis, and that the allegations in the Complaint demonstrate that 1st Signature's claims are premised on Brighton's allegedly improper reliance on the allegedly terminated LPA, and those claims will either succeed or fail based on the operation and interpretation of the LPA. [Filing No. 17 at 7-9.] For example, Brighton asserts, if the Court confirms Brighton's contention that it properly exercised its setoff rights under the LPA, 1st Signature's tort claims will fail as a matter of law, and Counts 3 through 7 of the Complaint "are

nothing more than an attempt to criminalize a business dispute over the exercise of contractual rights pursuant to the LPA and other written agreements Plaintiff elected not to attach to its Complaint." [Filing No. 17 at 8.]

### A.  Validity of the Forum Selection Clause

The parties do not dispute that Tennessee law governs the question of the validity of the forum selection clause, because the choice-of-law provision in the LPA designates Tennessee law. [*See* Filing No. 11 at 5; Filing No. 16 at 4.]  *See also Jackson v. Payday Fin., LLC*, 764 F.3d 765, 775 (7th Cir. 2014) ("In contracts containing a choice of law clause, therefore, the law designated in the choice of law clause would be used to determine the validity of the forum selection clause." (quoting *Abbott Laboratories v. Takeda Pharmaceutical Co*., 476 F.3d 421 (7th Cir. 2007)).

Under Tennessee law, "[a] forum selection clause will be upheld if it is fair and reasonable in light of all the circumstances surrounding its origin and application." *Blackwell v. Sky High Sports Nashville Operations, LLC*, 523 S.W.3d 624, 630 (Tenn. Ct. App. 2017).  In making that determination, courts consider all factors bearing upon the fairness of enforcing a forum selection clause, including: "(1) whether the plaintiff cannot secure effective relief in the other state, for reasons other than delay in bringing the action; (2) whether the other state would be a substantially less convenient place for the trial of the action than this state; (3) whether the agreement as to the place of the action was obtained by misrepresentation, duress, abuse of economic power, or other unconscionable means; and (4) whether it would for some other reason be unfair or unreasonable to enforce the agreement." *ESI Companies, Inc. v. Ray Bell Const. Co*., 2008 WL 544563, at *6 (Tenn. Ct. App. Feb. 29, 2008) (citing *Dyersburg Mach. Works, Inc. v. Rentenbach Eng'g Co*., 650 S.W.2d 378, 380 (Tenn. 1983)).  "Tennessee law is clear that the party challenging the enforcement of the forum selection clause bears the burden of demonstrating why the clause is unenforceable."

*Cohn Law Firm v. YP Se. Advert. & Publ'g, LLC*, 2015 WL 3883242, at *10 (Tenn. Ct. App. June 24, 2015).

1st Signature does not argue that enforcing the forum selection clause in the LPA would be unfair, unreasonable, or inconvenient based on any of the above factors ordinarily considered in evaluating the enforceability of a forum selection clause under Tennessee law. Instead, it merely argues that the forum selection clause does not apply because the entire LPA was invalidated by the Addendum under the merger doctrine. "The merger doctrine is well-established in Tennessee; the doctrine puts structure to ascertaining the parties' intent where there are successive agreements." *Great Am. Ins. Co. v. Nelson, Inc.*, 276 F. Supp. 3d 762, 768 (W.D. Tenn. 2017) (citing *Dunn v. United Sierra Corp.*, 612 S.W.2d 470, 474 (Tenn. Ct. App. 1980); 17A Am. Jur. 2d Contracts § 539 (2011)). Under the merger doctrine, when parties to a contract enter into a subsequent agreement concerning the same subject matter as the first agreement, the earlier contract merges into the latter contract and is rescinded or extinguished. *Great Am. Ins. Co*, 276 F. Supp. 3d at 768 (citation omitted). For the doctrine to apply, the two agreements "must contain inconsistent terms such that they cannot stand together as supplemental agreements." *Id.* (citations omitted). "Inconsistency of terms is the crux of the merger doctrine inquiry." *Id.*

Regarding forum selection specifically, the LPA and the Addendum are not inconsistent; the LPA designates a forum whereas the Addendum is silent as to that issue. Accordingly, 1st Signature asks the Court to compare the substantive terms of both agreements and conclude that the Addendum superseded and invalidated the LPA. But there are two problems with this strategy: (1) it is inconsistent with the allegations in the Complaint; and (2) it would require a merits analysis that should be avoided at this juncture.

First, 1st Signature specifically alleges in its Complaint that the LPA remained in effect, at least to some extent, with respect to various loans that predated termination of the LPA.  It also alleges that Brighton breached the LPA.  [*See* Filing No. 1 at 4 ("At the time of termination, Brighton had already committed to 230 unfunded loans under the [LPA].  Termination did not affect Brighton's obligations for those loans. . . . Brighton breached the agreement by failing to fund and purchase those loans.").]  The first count of the Complaint seeks a declaratory judgment concerning the parties' rights and obligations under the LPA, presumably becuase the issue of whether and to what extent the LPA remained in effect following the Addendum is a threshold determination underlying many of 1st Signature's remaining claims.  That is, the claims for theft, conversion, deception, and violation of RICO and the Indiana racketeering statute are dependent upon a determination that Brighton did not have the legal right or entitlement—under the LPA or otherwise—to take the actions is it alleged to have taken.  1st Signature's argument that the majority of its claims "have nothing to do with" the LPA is therefore disingenuous as best.  At least one Tennessee court has rejected a plaintiff's attempt to assert that the defendant breached a particular agreement while simultaneously arguing that the forum selection clause contained in that same agreement does not apply because the agreement was not valid.  *See Sevier Cty. Bank v. Paymentech Merch. Servs., Inc*., 2006 WL 2423547, at *5 (Tenn. Ct. App. Aug. 23, 2006) ("The Agreement either does or does not apply.  The Bank cannot be heard to claim that only certain portions of the Agreement which are beneficial to its case apply, but all others do not.").

In addition, a determination concerning the validity of the LPA in its entirety could have a preclusive effect as the litigation proceeds, and the Seventh Circuit has suggested that courts conducting a forum analysis should avoid deciding issues related to the validity of the underlying contract where a forum selection clause specifically assigns such decisions to another court.  In

*Muzumdar v. Wellness Int'l Network, Ltd.*, 438 F.3d 759, 760-61 (7th Cir. 2006), the plaintiffs filed lawsuits in Illinois federal court alleging violations of RICO and other federal and state laws relating to distributorship contracts that plaintiffs alleged constituted illegal pyramid schemes. The contracts at issue contained forum selection clauses designating Dallas County, Texas. *Id.* The Seventh Circuit affirmed the district court's dismissal of the lawsuits without prejudice pursuant to the forum selection clauses, stating:

> Appellants also spend a good deal of time trying to convince us that because the contracts themselves are void and unenforceable as against public policy—i.e., they set out a pyramid scheme—the forum selection clauses are also void. The logical conclusion of the argument would be that the federal courts in Illinois would first have to determine whether the contracts were void before they could decide whether, based on the forum selection clauses, they should be considering the cases at all. An absurdity would arise if the courts in Illinois determined the contracts were not void and that therefore, based on valid forum selection clauses, the cases should be sent to Texas—for what? A determination as to whether the contracts are void?

> What is true is that a forum selection clause can be found invalid because the clause itself was procured by fraud. As the Court established in *The Breman v. Zapata Off–Shore Co.*, 407 U.S. 1, 15, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), a forum selection clause will be enforced unless it can be clearly shown "that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." Appellants make no attempt to show that the forum selection clause was itself obtained by fraud.

*Id.* at 762.

In a similar vein, courts have concluded that forum selection clauses may still be enforced even where disputes remain as to the validity of the agreements containing those clauses. *See Williams v. MJC Acquisition, LLC,* 2020 WL 3411178, at *3 (N.D. Ind. June 22, 2020) (noting that "determining the validity of a forum selection clause is a distinct analysis from determining the validity of the underlying contract"); *Warner v. St. John's Nw. Military Acad. Inc.*, 2019 WL 403718, at *6 (E.D. Wis. Jan. 31, 2019) ("This Court need not decide whether the Enrollment Agreement is an exculpatory contract [that is void under Wisconsin law] because resolution of that

question does not affect the forum-selection analysis."); *Stifel, Nicolaus & Co. v. Lac du Flambeau Band of Lake Superior Chippewa Indians*, 980 F. Supp. 2d 1078, 1087 (W.D. Wis. 2013) (noting that "the ultimate validity of the Transaction Documents is generally immaterial to an analysis of the documents' forum selection clauses"); *Miglin v. Mellon*, 2008 WL 2787474, at *1 (N.D. Ill. July 17, 2008) (forum selection clauses "are enforced even when parties allege that the contract containing the clause is void or unenforceable"); *see also Afram Carriers, Inc. v. Moeykens*, 145 F.3d 298, 301-02 (5th Cir. 1998) (noting that a determination regarding the enforceability of a forum selection clause must "precede any analysis of the merits" and stating, "[w]ere we to judge the soundness of the forum-selection clause by what we believe to be the merits of the underlying contract, we would subvert the aforementioned comity concerns by making a merits inquiry that the Supreme Court has determined is best left to the forum selected by the parties").[3]

The same absurdity observed in *Muzumdar* would result if the Court were to conduct a substantive analysis of the LPA, conclude that it is valid, and then transfer the case to the Western District of Tennessee—for what?  A determination of whether the LPA remained in effect (or not) and entitled Brighton (or not) to the funds that it allegedly stole or converted?  *See* 438 F.3d at 762.  The parties are sophisticated business entities that chose Tennessee as the appropriate forum for adjudicating "any litigation commenced by [Brighton] against [1st Signature] or by [1st Signature] against [Brighton] on any basis."  If the Court were to entertain 1st Signature's argument that the entire LPA is void, it would be allowing 1st Signature an end-run around that agreement.

---

[3]At least one Tennessee court has recognized that where a plaintiff can demonstrate that the underlying contract was procured by fraud, the entire contract is rescinded and therefore the parties are not bound by the forum selection clause contained in the contract. *Lamb v. MegaFlight, Inc.*, 26 S.W.3d 627, 631 (Tenn. Ct. App. 2000).  Such circumstances are not present in this case, and there does not appear to be any other case addressing the question of validity of the underlying contract for purposes of analyzing a forum selection clause, outside the context of alleged fraud.

1st Signature has made no specific argument that it cannot secure effective relief in Tennessee, that Indiana would be a substantially more convenient forum, or that agreement to a Tennessee forum was obtained through fraud or other unconscionable means. *See ESI Companies, Inc.*, 2008 WL 544563, at *6; *Dyersburg*, 650 S.W.2d at 380. Absent such a showing, and without any clear contradiction between the LPA and the Addendum as to the issue of forum, the Court concludes that it is not inherently unfair or unreasonable to hold 1st Signature to its agreement, and the forum selection clause in the LPA is valid and enforceable.

Finally, to the extent that 1st Signature argues that the forum selection clause cannot apply because the LPA was terminated, that argument misses the mark. Courts in Tennessee and in this Circuit "routinely enforce forum-selection clauses after a contract is terminated unless the terms of the contract itself indicate otherwise." *Payne v. N. Tool & Equip. Co.*, 2013 WL 6019299, at *3 (N.D. Ind. Nov. 12, 2013) (concluding that "whether or not the Vendor Agreement was terminated is inconsequential to whether the forum-selection clause is enforceable"); *see also Allied Sound, Inc. v. Dukane Corp.*, 934 F. Supp. 272, 275 (M.D. Tenn. 1996) (citing *Advent Elec., Inc. v. Samsung Semiconductor*, 709 F. Supp. 843 (N.D. Ill. 1989), for the proposition that "the termination of a contract does not void a choice of forum clause unless the language of the contract expressly or implicitly indicates such a result"). Here, 1st Signature points to nothing in the LPA indicating that termination of the agreement also terminated the forum selection provision. To the contrary, as discussed above, 1st Signature acknowledges in the Complaint that some obligations did indeed survive termination of the LPA.

## B.  Scope of the Forum Selection Clause

1st Signature asserts that even if the forum selection clause is valid, its claims do not fall within the scope of disputes covered by the clause because the claims arise out of the Addendum

and Brighton's allegedly criminal acts, not out of the LPA itself.  That argument ignores both the broad language of the forum selection clause and the relationship between the LPA and the claims asserted.

In *Tennsonita (Memphis), Inc. v. Cucos, Inc.*, 1991 WL 66993, at *2 (Tenn. Ct. App. May 2, 1991), the Tennessee Court of Appeals addressed the question of "whether the forum selection clause in a previous contract is applicable to a subsequent contract."  In that case, the parties entered into a written development agreement and a written licensing agreement in connection with franchising a restaurant.  *Id.* at *1-2.  Both written contracts contained a forum selection provision stating that "any action brought by either party against the other in any court, whether federal or state, shall be brought within the State of Louisiana." *Id.* at *2.  The parties subsequently entered into an oral takeover agreement, which contained no forum selection provision, and when the relationship soured, the plaintiffs sued the defendant for breach of the takeover agreement, misrepresentation, common law fraud and deceit, negligent misrepresentation, and violation of the Tennessee Consumer Protection Act.  *Id.* at *1-2.

The appellate court affirmed the trial court's dismissal of the case based on the forum selection clauses, concluding that the clauses contained in the written contracts applied to claims based on the subsequent oral agreement. *Id.* at *2-3.  In doing so, the appellate court acknowledged that the oral agreement was "a completely separate contract" from the prior written agreements, but determined that the oral agreement nonetheless arose out of the relationship created by the prior agreements, and the language of the forum selection clauses was broad enough to "encompass[] any dispute arising out of or in connection with the franchisor-franchisee relationship." *Id.* at *3.  In other words, "such clauses cover all causes of action arising directly or indirectly from the business relationship evidenced by the contract." *Id.* (internal quotations and

15

citation omitted).   Specifically, the court explained: "[W]ithout the License Agreement, the Plaintiffs never could have opened the Memphis restaurant for which the Takeover Agreement was structured.  The Takeover Agreement must arise indirectly from the Development and License Agreements because without those previous agreements, there can be no business on which to base the Takeover Agreement."  *Id.*

Similar to the forum selection clauses at issue in *Tennsonita*, the forum selection clause in the LPA by its terms applies to "any litigation commenced by [Brighton] against [1st Signature] or by [1st Signature] against [Brighton] on any basis."  In addition, the relationship between 1st Signature and Brighton arose out of the LPA, regardless of whether and how that relationship was subsequently altered by the Addendum.  [*See* Filing No. 1-2 at 1 (provision of the Addendum stating that the parties "will continue to carry on their normal course of business of the sales of mortgage loans").]  Accordingly, "any dispute arising out of or in connection with" the parties' business relationship is covered by the forum selection clause contained in the LPA.  *See Tennsonita*, 1991 WL 66993, at *3.

1st Signature attempts to define Brighton's conduct as separate from the parties' contractual relationship, arguing: "The duty not to steal does not arise from the LPA."  [Filing No. 16 at 7.] That may be true as a general principle.  But 1st Signature ignores the fact that Brighton's alleged retention of funds can only constitute "stealing" if Brighton did not have an entitlement—for example, a surviving right under the LPA—to apply those funds to an existing balance.  As articulated above, the Court expresses no opinion as to the parties' rights and obligations under the LPA or the extent to which those rights and obligations survived the Addendum or affected the parties' rights and obligations with respect to the lines of credit.  Such a determination requires interpretation of the LPA.  This dispute arises in connection with the parties' business relationship

and is therefore within the scope of the forum selection clause and must be adjudicated in the Western District of Tennessee.

## IV.
### CONCLUSION

Based on the foregoing, Brighton's Motion to Transfer Venue, [10], is **GRANTED**.  The Clerk is **DIRECTED** to transfer this case to the United States District Court for the Western District of Tennessee.

Date: 12/11/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**